# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01062-COA

**MARTIN WHEELAN**                                                                 **APPELLANT**

**v.**

**CITY OF GAUTIER AND DAVID A. VINDICH**                          **APPELLEES**

DATE OF JUDGMENT:                        02/20/2019
TRIAL JUDGE:                                    HON. MICHAEL H. WARD
COURT FROM WHICH APPEALED:    JACKSON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:           ROBERT E. O'DELL
ATTORNEYS FOR APPELLEES:          EDWARD C. TAYLOR
                                                       A. KELLY SESSOMS III
                                                       NATHAN RYNE HAND
                                                       NICOLE WALL SULLIVAN
NATURE OF THE CASE:                     CIVIL - REAL PROPERTY
DISPOSITION:                                   AFFIRMED - 02/23/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**McDONALD, J., FOR THE COURT:**

¶1.     Martin Wheelan appeals from the Jackson County Chancery Court judgment upholding the City of Gautier's grant of a building permit to David Vindich, authorizing Vindich to erect a 1,410-square-foot accessory structure on his property. Vindich cross-appeals from the chancery court's judgment that also dismissed his claims against Wheelan for slander of title, as well as the chancery court's order denying him attorney's fees. After a review of the record, arguments of counsel, and relevant precedent, we affirm the chancery court's rulings.

**FACTS**

*A.     Vindich's Planned Project and Initial Meetings Concerning a Permit*

¶2.     In 2015, Vindich purchased a .76-acre tract in a low-density residential neighborhood in Gautier, Mississippi.[1]  Vindich's property was larger than most of the quarter-acre lots in the area.  Located on the property was Vindich's 2,840-square-foot home, gazebo, pool, and boat house that was built partially on land and partially over the abutting canal.

¶3.     Vindich initially desired to build an 1,800-square-foot garage/workshop on the property.  In May 2015, before ordering the plans for the building, Vindich met with Scott Ankerson, the city's planning director, to discuss the project.[2]  According to Vindich, Ankerson verbally approved a 1,410-square-foot building, but Ankerson later denied this.  Vindich moved forward and spent $9,800 to purchase the plans that were required to be attached to the formal application for the building permit.

*B.     The Relevant Ordinance Provision*

¶4.     Vindich's permit application was subject to the building guidelines found in Gautier's Uniform Development Ordinance (UDO) that the city adopted on September 29, 2009 and updated on November 5, 2015.  Under Section 4.5 A of the UDO, no building can be erected without a permit issued by the city manager or his designee, who is to insure that the permit

---

[1] Vindich is a Gautier native who returned to retire after twenty-six years of service in the Marines.

[2] Vindich says he also met at different times with individuals named "Wes" and "Cody" in the planning department before he moved forward with ordering his plans.

conforms to the provisions of the UDO. Under Section 4.5.1 A, all applications for building permits must have the plans for the building attached and a survey drawn to scale.

¶5.     A key UDO provision that affected Vindich's project was Section 5.4.4. It set a limit for the total square footage of all buildings on a lot and set limits for the size of the accessory buildings:

> F.   Maximum Lot Coverage—Twenty-five (25) percent for the principal structure and accessory structures. Accessory Structures shall not exceed twenty (20) percent of the rear lot area or fifty (50) percent of the main building area, whichever is less.

Vindich's .76-acre lot contained 33,105.6 square feet. Therefore, according to the first part of Section 5.4.4 F, the *total* of all structures on his property could not exceed 8,276.4 square feet (25% of 33,105). Less clear, and more problematic, was the computation of the limits to the size of the accessory buildings found in the second part of this section. The UDO provided no definition for the term "rear lot area." Nor is there any definition in the UDO for "main building area," though Section 2.1.3 does define "buildable area" as "the space remaining on a lot after the minimum open space offset and setback requirements have been complied with; excepting any flood plain wetland or similarly designated unbuildable lands."

### C.     Vindich's Permit Application and Department Denial

¶6.     Vindich submitted his building permit application with the plans attached on February 8, 2016. The Building Department denied Vindich's application that same day because of the size of the proposed workshop. Department personnel contended that the "main building area" referred to in Section 5.4.4. F. meant the size of Vindich's house, which was 2,840

3

square feet. Therefore, the department contended that the limit to accessory structures was 50% of the size of the house, or 1,420 square feet. The department also contended that all accessory structures, added together, could not exceed this 50% of the size-of-the-home limit. The department added up the size of the accessory structures already located on Vindich's property as follows:

| | |
|---|---|
| Pool House | 140 |
| Gazebo | 375 |
| Boat House | 614 |
| Total | 1,129 |

The department concluded that according to its interpretation of Section 5.4.4. F, Vindich was limited to 1,420 square feet for all accessory buildings (50% of the 2,840-square-foot residence). It reasoned that because Vindich already had 1,129 square feet of accessory buildings, he could only build a 291-square-foot workshop [50% of the size of the home (1,420 square feet) minus the square footage of the existing accessory buildings (1,120 square feet) equaling 291 square feet]. Vindich disagreed with the department's interpretation of the meaning of "main building area" and its interpretation of the size limitation of accessory buildings (whether the UDO meant them to be aggregated in size or considered individually).

D. *Vindich's Appeal to the Planning Commission with Rationale*

¶7. On February 16, 2016, Vindich appealed the department's denial of his building permit to Gautier's Planning Commission. He submitted a "Public Hearing Application," a form that contained several options of appeals and fees depending on the type of appeal,

4

including "zoning changes," "major development," "variance," and "appeal to staff decision." Vindich checked "appeal to staff decision" as his reason for requesting a public hearing. Under the UDO, the appeal of a staff decision on a building permit does not require notice to neighboring property owners as would the appeal of a request for a variance.

¶8. Vindich attached to his hearing request a hand-written statement summarizing his initial meeting with Ankerson, who Vindich said had given a verbal approval of the project. Vindich also attached a type-written argument with his interpretation of the terms in the UDO and his calculations that showed how his proposed workshop met the criteria of the UDO limits of accessory-structure size. Using the dimensions on the official survey he also had to submit with his application, Vindich showed that the total square footage of his house (2,843.74 square feet) plus the square footage of his current accessory buildings (1,034.6 square feet)[3] was 3,878 square feet.

¶9. The second part of Section 5.4.4 F reads, "Accessory Structures shall not exceed twenty (20) percent of the **rear lot area** or fifty (50) percent of the **main building area**, whichever is less." (Emphasis added). Vindich noted the ambiguity of the term "main building area," which the UDO did not define. The department felt this term meant the main residence, but it could also mean the "buildable area," which the UDO does define, on Vindich's entire lot.

_____

[3] From the survey, he calculated that his house covered 2,843.74 square feet. The accessory buildings covered the pool house (147.29), gazebo (404.6), and boat house (482.37), totaling 1,034.6 square feet.

¶10.    Department personnel never calculated the first part of the second sentence of Section 5.4.4 F, i.e., the size of the "rear lot area," which is to be compared to the size of the "main building area." Vindich did. From the survey, he calculated the front yard square footage (3,068.1) and his house square footage (2,843.74) and subtracted each from the square footage of the entire lot (33, 105.6 minus 3,068.1 minus 2,843.74) which results in the "rear lot" square footage of 27,193.76. He then took 20% of that number to get the limit referred to in Section 5.4.4 F (20% x 27,193.76) to get 5,478 square feet as the "rear lot area." according to Section 5.4.4 F, Vindich argued that this figure would then be compared to 50% of the "main building area," and whichever is less becomes the limit of the size of an accessory building.

¶11.    Vindich then calculated the "main building area" in two ways, depending on what the term "main building area" meant. If "main building area" meant the overall size of the lot, again referencing the definition of "buildable area," then the 50% referred to in Section 5.4.4 F would be 50% times 33,105.6 square feet, equaling 16,552.8 square feet. But comparing this amount to 20% of the "rear lot area" (5,478 square feet), the "rear lot area" was less. Therefore, Vindich concluded that if "main building area" meant the overall size of the lot, the limit for any new accessory building would be the "rear lot area," or 5,478 square feet. Vindich reasoned that because he already had 3,878 square feet of buildings on his property, Vindich had 1,600 square feet available to build his workshop (5,478 square feet less 3,878 square feet).

¶12.   In the alternative, if the phrase "main building area" means the size of the house, 2,843.74 square feet, then 50% of that would limit an accessory structure to 1,421.87 square feet (which is less than the 5,478 square feet that was calculated as the 20% of the "rear lot area"). Vindich contended that his 1,410-square-foot workshop still met the UDO accessory-building-size criteria even if the definition of "main building area" was the size of the house, assuming that the UDO terminology meant the size limit for **each** accessory building.

E.    *Planning Commission Meeting and Vote*

¶13.   Prior to the Commission's meeting to consider Vindich's appeal, Chandra Nicholson, the Planning and Economic Development Director, submitted the department's rationale in a staff report dated April 1, 2016.   It did not deal with the computation of all portions of Section 5.4.4 F but solely the computation of what the department considered was the limit on a total of the accessory buildings, which it contended was 50% of the square footage of the house.  Also before the commission meeting, four of the seven commissioners visited the property, and two other commissioners communicated with staff.

¶14.   At the Planning Commission's meeting on April 7, 2016, Vindich reviewed his interactions with building department personnel Wes, Cody, and Ankerson, as well as the events leading up to his application for the permit.[4]   One commissioner noted the lack of

---

[4] There was discussion about whether Section 4.4 F limited the square footage of the accessory buildings individually or in the aggregate. In support of her position, Nicholson pointed out that Section 5.4.4 F refers to "accessory structures" with an "s" (in the plural form), indicating that it meant the square footage of all accessory buildings together.

definition of "main building area" in the UDO and asked the city attorney whether Vindich's interpretation of that term (i.e., the entire lot or even buildable area on the lot) had any validity. The city attorney replied that he had not thought about it in the way Vindich presented it. Another commissioner raised the hypothetical of a person adding on to their house and thus gaining additional allowable storage space. Also, it was raised that the staff's interpretation would mean that a person with ten acres, but only an 1,100-square foot-home would have limited square footage available for accessory buildings even though that person had a large piece of property. Everyone agreed that the interpretation of the UDO was a "gray area." Vindich voiced some frustration because he felt that by talking informally to the building permit department before he ordered the plans, he would avoid the problem he now faced; namely, that he had spent nearly $10,000 to get the plans he was told he needed, only to have permission for the project denied. He also told the commissioners that he had spoken to the neighbors about his plans and shown them pictures of the building he was going to order. No one had a problem with the workshop he planned to erect. Vindich's brother-in-law told the commissioners he could verify that Vindich "did his best to make sure it would fly before he ordered the building." One commissioner commented that he felt that they needed to be just a little bit flexible and that what Vindich proposed fits the environment. But another commissioner felt that if they deviated from the definition of "50 percent of the 'main building area'" as the staff interpreted it just because Vindich's lot was large, then owners of smaller lots may want the same deviation. This commissioner felt that

8

any deviation would be arbitrary. But another felt that approving the building permit because Vindich's lot was larger than the standard lot was not arbitrary, but reasonable. Ultimately, the motion to reverse the staff decision and allow Vindich to build the 1410-square-foot-workshop passed on a 4-3 vote.

*F.      City Council Meeting and Vote*

¶15.    But the Planning Commission was not the final authority on the matter; it only recommended a position to Gautier's City Council, which is the final arbiter of UDO interpretations and applications. The City Council met on April 19, 2016, to discuss the Planning Commission's recommendation that Vindich be granted the building permit.[5] Vindich appeared and told the members basically what he had told the Planning Commission.[6] They discussed with Vindich and staff members the genesis of the Vindich's building permit application. Staff acknowledged that they did meet with Vindich prior to the formal application.[7] But they said they only gave him the general percentages available in Section 5.4.4. They were not aware that the boat house was built partially on land, so any prior calculations they may have made would have been incorrect. Department personnel

---

[5] It should be noted that both the Planning Commission and City Council publish their agenda items on their website prior to each meeting.

[6] This included his meetings with department staff and that he was ultimately told that he could build a 1,410-square-foot workshop. He proceeded to purchase plans that cost him nearly $10,000 to enable him to submit the formal permit application.

[7] The only evidence of the City Council meeting was a recording on which it is difficult to identify who from the staff appeared and which member of the council was speaking at any specific time.

9

argued to the council their interpretation of the UDO provision, namely that Vindich's plans, including the square footage of all accessory buildings, exceeded the 50% of the square footage of the main residence (which was how they obviously interpreted the term "main building area"). But they also suggested that the council eliminate the 50% rule when the council next met to update the code. One councilman noted that Vindich's lot was three times the size of a standard lot. But another councilman felt that the council could not bend the rules for one person. One councilman asked if they could grant Vindich a conditional use or variance. The staff responded that they could not. In a 4-3 vote, the Council accepted the Planning Commission's recommendation and allowed Vindich to build his 1,410-square- foot workshop. On that same date, the City Council issued an order memorializing the vote. Thereafter, Vindich proceeded to construct the workshop as permitted.

¶16.    Thereafter, Vindich's neighbor, Wheelan, whom Vindich had told earlier about his plans and who had told Vindich to get the permit, returned from a trip to see that construction had begun. Without Vindich's knowledge or permission, Wheelan went onto Vindich's property and measured the size of the forms of the foundation. Wheelan objected to the size of the building and told Vindich that he planned to do something about it. Wheelan felt it was not right that such a large building could be permitted.[8] Wheelan downloaded the UDO and read through it. He accessed Vindich's appeal online and reviewed the calculations

_____

[8] Wheelan admitted that he trespassed on Vindich's property to measure the foundation's forms to get the dimensions of the workshop.

Vindich had made. Wheelan then learned from the building permit department that the department had rejected Vindich's permit application but that the Planning Commission and the City Council had reversed that decision. Wheelan met with a person named Scott, who advised him to go to the next Planning Commission meeting to address the issue if he wanted to.[9] Only months later did Wheelan take legal action.

### G. Litigation

¶17. After Vindich's building was nearly completed, on October 24, 2016, Wheelan filed suit in the Jackson County Chancery Court against Vindich, the City of Gautier, and the individual members of the Gautier City Council. Wheelan alleged that the City Council's order was unlawful because in reality, Vindich was not seeking a building permit but rather a variance, which required a public hearing with notice to neighbors and the public at large. As a result, Wheelan pleaded that he was denied due process under 42 U.S.C. § 1983. Wheelan also claimed that the City Council violated Mississippi Code Annotated section 17-1-17 (Rev. 2003) because its actions were "arbitrary and capricious, an abuse of discretion, beyond their legal authority, an abuse of power and unsupported by substantial evidence." Finally, against Vindich personally, Wheelan pleaded that the workshop "completely overwhelms the residential neighborhood," interfering with Wheelan's enjoyment of his

---

[9] There was no transcript or recording of this subsequent Planning Commission meeting, but Wheelan admitted that he did attend the meeting and told the Commission that he had no problem with Vindich's building the shed and that the height of the building was irrelevant. Apparently, Wheelan took no further action thereafter until October when he filed suit.

property and creating a nuisance.

¶18.    The individual council members and Vindich answered the complaint. In Vindich's answer, he counterclaimed against Wheelan for slander of title. Both Vindich and the City filed Mississippi Rule of Civil Procedure 12(b)(6) motions to dismiss Wheelan's complaint for failure for state a claim and/or summary judgment. They argued that Wheelan failed to exhaust his administrative remedies in a timely fashion because the UDO establishes a ten-day deadline for appealing decisions by the city council, and Wheelan failed to do so. Moreover, Mississippi Code Annotated section 11-51-75 (Rev. 2012) also requires that anyone aggrieved by an action of a municipal authority appeal that decision within ten days of the adjournment of the session in which the action was taken. They also pleaded that the Mississippi Supreme Court has established the circuit court as the appellate court for municipal-action appeals, not the chancery court. Because Wheelan alegedly failed to exhaust the administrative process, Vindich and the City argued that the chancery court did not have jurisdiction to hear Wheelan's challenge to the city's order granting the building permit.

¶19.    Wheelan responded to these motions and argued that his was a claim for the deprivation of his constitutional rights under 42 U.S.C. § 1983 and that because he was seeking injunctive relief, the chancery court had subject matter jurisdiction. Moreover, he argued that the Mississippi Supreme Court has held that when the notice of a hearing is deficient, the remedy of appeal provided for in section 11-51-75 was not exclusive. Wheelan

12

reiterated that Vindich's workshop did not comply with the UDO, and thus it was a non-conforming use that required a variance, which had different notice requirements. Because of that, Wheelan argued that he was denied due process.

¶20. All three chancery court judges in the Sixteenth Judicial District, which includes Jackson County, recused, and the Mississippi Supreme Court appointed a special judge to hear the matter. The special chancery court judge denied both the City's and Vindich's motions to dismiss or, in the alternative, for summary judgment on November 15, 2017. The chancery court thereafter conducted a trial on the matter on June 25, 2018.

### H. Trial and Chancery Court Rulings

¶21. During his case-in-chief, Wheelan testified, as did Ankerson, realtor Anna Kral,[10] and neighbor Leonard Frederick Sr. Ankerson explained his interpretation of Section 5.4.4 F, i.e., that the total square footage of all accessory buildings could not exceed 50% of the square footage of the main residence. He admitted that when he first met with Vindich, he may have told him that there were 1,410 square feet available for accessory buildings. But he meant 1,410 square feet for *all* accessory buildings and Vindich must have misunderstood him. Ankerson said he did not verbally approve a single building of that size. During his testimony, Ankerson read the UDO's definition of "building area": "the space remaining on

---

[10] Anna Kral, the real estate agent for the seller in the sale of the home to Vindich, testified to its sales price of $250,000. When Wheelan's attorney tried to elicit testimony from Kral about the value of other homes in the area, the defendants objected because Kral had not been designated as an expert. The chancery court agreed with the defendants and prohibited Kral from giving such testimony.

a lot after the minimum open space offset and setback requirements have been complied with; excepting any flood plain wetland or similarly designated unbuildable lands." Ankerson agreed that this definition can be applied in interpreting Section 5.4.4 F's reference to "main building area." He admitted that Section 5.4.4 F contains no language referencing the *square footage of the main house*. Ankerson also admitted that Vindich's interpretation of the UDO provisions was reasonable and that the building department has actually been using it since the Planning Commission and City Council approved Vindich's permit. Ankerson also agreed that Vindich's workshop met the height requirements of Section 5.4.4 E (25 feet). Ankerson confirmed that Vindich did not ask for a variance and that no notice to neighboring property owners was required for the appeal of a building permit denial. Ankerson said he did not issue a written refusal but that he spoke to the department's director, Shandra Nicholson, and they agreed on refusing Vindich's permit application.

¶22.    Wheelan testified about the information he received prior to the grant of the permit and what he did after he surreptitiously measured the building's foundation. Wheelan said that 80% of his view of the canal is now blocked by Vindich's building. But he admitted that his view is over Wheelan's property and that he had no legal right, such as an easement, to such a view. Wheelan said he purchased his house in 2005 for $97,000 and that he had made improvements to his property. Without the Vindich workshop, Wheelan estimated he could sell his property for $135,000, but with the Vindich building, he lost 20% of the $135,000 value. Although he talked to an appraiser, Wheelan did not have an appraisal prepared and

14

admitted that this "estimate" was more of a "guess." Wheelan agreed that under another section of the UDO, Vindich could have lawfully built an eight-foot fence on his property that would also have obstructed Wheelan's view of the canal. Still, Wheelan had issues with the workshop building itself. He testified that his main "gripe" was that the City denied him due process. Wheelan also admitted that there were different interpretations that could be drawn from the wording of the UDO and that he did tell his neighbors that he believed Vindich's permit was illegal.

¶23. Frederick, a landowner who lived across the canal from Vindich, testified that he knew nothing of Vindich's workshop plans until an 18-wheeler pulled up and off-loaded the steel and metal building parts. Frederick had bought his house in 1993 for $42,000. He testified that he planned to sell it and called the realtor, Kral, to view the property. She never gave him an estimate, but Frederick said that he wanted to sell the property for $349,000, and that "if you look on Zillow now, the value of the property is $198,000."

¶24. Finally, Wheelan presented as evidence the recording of the City Council's meeting on the Planning Commission's recommendation, which completed his presentation. The defendants then each moved for a directed verdict. The court dismissed Wheelan's case against the individual councilmen but denied the City and Vindich's motions for directed verdicts.

¶25. The City presented two witnesses: Phil Torgusen, the mayor of Gautier and former Planning Commission member, and City Councilman Charles Anderson. Torgusen sat on

15

the Planning Commission that considered Vindich's appeal. He explained that he felt that Section 5.4.4F could have different interpretations and that at some point the Code would need to be modified because of this. One interpretation (the Department's) was that the "main building area" included the square footage of the accessory buildings already there compared to the square footage of the main house. He said that there was nothing in the ordinance that said the square footage of the residence should be used. Vindich had a different interpretation of the term "main building area," namely the square footage of the entire lot. Torgusen said that the Planning Commission has dealt with variances before, but Vindich's situation was not considered by the Commission as a variance. On cross-examination, Torgusen agreed that he used the word "exception" during the Commission meeting, but he said he did not mean it as a variance:

> Q. Okay. And other than saying you wanted to give Mr. Vindich an exception, in the next paragraph you said you wanted to make it a one-time exception. Certainly that applied to Mr. Vindich. Did it not?
>
> A. Well, it did apply to him, but what I was saying was that I thought there would be a small window of time where we could address the UDO and get it defined clearly before any other issue came back up. So I didn't think that doing this one right there would hurt --
>
> Q. Okay. So you thought --
>
> A. -- on the interpretation we used.

Thus, Torgusen explained he felt that the Commission was applying what it considered was the correct interpretation of the UDO in Vindich's case and that future modifications of the UDO would make this clearer.

16

¶26. Councilman Anderson testified that the City Council did not grant Vindich a variance. Following Councilman Anderson's brief testimony, Vindich testified that he spoke to his neighbors about building a workshop before he took any steps. He said he never referred to it as a "shed." No one had any objections, but Wheelan cautioned him to get a permit. Vindich said he met with city personnel about his project four times. Ankerson checked Vindich's property size on the computer and calculated that he could build a 1,411-square-foot building. Vindich then purchased plans for a 1,410-square-foot-building that cost him nearly $10,000, which was not refundable. He submitted these plans with his building permit application, only to have it denied. He met again with the building department, which explained the appeal process. Vindich appealed and met with the City Planning Commission, which decided to recommend to the City Council that the department's decision should be reversed. Vindich attended the City Council meeting, where the recommendation was made and accepted. Both the Planning Commission and the City Council meetings were public with published agendas. After Vindich received the permit, he began building. Vindich testified that Wheelan approached him only once thereafter, in June 2016, when Wheelan told Vindich that he did not like Vindich's building plans and that he intended to do something about it. At first Vindich waited, but hearing nothing further from Wheelan, Vindich continued to build. He heard nothing more until October 2016, when he was sued. He stopped work on the building at that time, but he had already spent nearly $40,000 on it ($10,000 for the plans and over $29,000 for materials and labor). Other people had told him

17

that Wheelan had said Vindich did not have a permit for the building, and then that Vindich's permit was illegal. Vindich said that this hurt his reputation and affected his relationship with his neighbors. Vindich also said that he had to incur legal fees of $30,000 because of Wheelan's claims.

¶27. After considering the testimony, on February 20, 2019, the chancery court issued an opinion and final order dismissing Wheelan's claims against the City and Vindich, finding that the City's interpretation of the ordinance was not manifestly unreasonable. The court also found that the structure was not a nuisance because the law does not vest one with a right to an unobstructed view across a neighbor's property. Additionally, the court dismissed Vindich's counterclaim of slander of title.

¶28. Wheelan filed a motion to amend or correct the judgment and motion for reconsideration of the chancery court's ruling on his claim against the City. The City replied to Wheelan's motion, as did Vindich, even though the motion did not deal with Wheelan's claim against him. Vindich cross-moved for reconsideration of the chancery court's ruling denying Vindich's slander-of-title claim. He sought attorney's fees as damages for the slander-of-title claim, but he also sought attorney's fees under Mississippi Code Annotated section 11-55-5, alleging that the Wheelan's nuisance claim was brought "without substantial justification." After hearing argument from counsel, the chancery court denied both Wheelan's motion and Vindich's cross-motion.

¶29. Wheelan appealed, and Vindich cross-appealed. Wheelan claims (1) that the City's

decision was unlawful because it violated the UDO and (2) that he and other neighboring property owners were deprived of due process because they received no notice of the City Council's meeting to discuss Vindich's application and consequently were denied the right to be heard. Wheelan did not appeal the chancery court's dismissal of his nuisance claim against Vindich. Vindich argues in his cross-appeal: (1) that the chancery court erred in denying his motion to dismiss (i.e., that the chancery court had no jurisdiction to hear Wheelan's challenges to the City Council's actions); (2) that Wheelan's claim was frivolous and that the chancery court erred in not awarding Vindich damages, costs, and attorney's fees; and (3) that the chancery court erred in dismissing Vindich's counterclaim against Wheelan for slander of title.[11]

---

[11] Vindich raises several other "issues" that we need not address. He argues that because Wheelan raises no issue on appeal relating to Vindich's conduct; therefore, the chancery court judgment in favor of Vindich on Wheelan's claim against him personally (i.e., nuisance) should be affirmed. But Wheelan did not challenge the chancery court's ruling on the nuisance claims, and Wheelan confessed in his reply brief that the chancery court's dismissal of Wheelan's nuisance claim against Vindich remains in full force and effect. So we need not deal with that issue raised by Vindich.

Even though Wheelan did not appeal the nuisance claim, Vindich lists as another issue: "Wheelan does not have a legal right to an unobstructed view across Vindich's property so no nuisance existed." But because Vindich obtained the relief he sought from the chancery court, i.e., the dismissal of the nuisance claim, Vindich cannot cross-appeal a decision regarding the nuisance claim. *Forrest County v. Thompson*, 204 Miss. 628, 657, 37 So. 2d 787, 793 (1948). Nor will we consider Wheelan's response to Vindich's argument on nuisance because Wheelan did not appeal the chancery court's nuisance ruling in his direct appeal, and he cannot raise an issue in a reply brief. *Ogunbor v. May*, 204 So. 3d 840, 848 (¶33) (Miss. Ct. App. 2016).

In addition, both Vindich and the City argue as an issue that Wheelan's attachments to his appellate brief should not be considered by this Court because they were not presented to the chancery court at trial. We agree because appellate courts "will not consider new

**STANDARD OF REVIEW**

¶30.    This Court "will not disturb a chancellor's findings unless they are manifestly wrong, clearly erroneous, or the chancellor applied an erroneous legal standard." *Estate of Avakian v. Wilmington Tr. Nat'l Ass'n*, 231 So. 3d 208, 213-14 (¶22) (Miss. Ct. App. 2017); *Howard v. Gunnell*, 63 So. 3d 589, 593 (¶8) (Miss. Ct. App. 2011). "We apply an abuse-of-discretion standard when reviewing a chancellor's decision." *Id.* (citing *Creely v. Hosemann,* 910 So. 2d 512, 516 (¶11) (Miss. 2005)). A board's zoning decision will be affirmed "unless it is clearly 'arbitrary, capricious, discriminatory, illegal, or without a substantial evidentiary basis.'" *Hatfield v. Bd. of Supervisors of Madison Cnty.*, 235 So. 3d 18, 21 (¶10) (Miss. 2017) (quoting *Drews v. City of Hattiesburg*, 904 Sp. 2d 138, 140 (¶5) (Miss. 2005)). "Local authorities' construction of zoning ordinances is given great weight unless their construction is manifestly unreasonable." *Roundstone Dev. LLC v. City of Natchez*, 105 So. 3d 317, 321(¶15) (Miss. 2012).

**DISCUSSION**

I.    **Whether the chancery court had jurisdiction to consider Wheelan's challenge to the City Council's actions.**

¶31.    Early in the litigation, both the City and Vindich moved to dismiss Wheelan's complaint based on Wheelan's failure to exhaust his administrative remedies, i.e., appeal the

---

evidence for the first time on appeal." *W-T Holdings LLC v. Gilchrist*, 299 So. 3d 808, 814 (¶24) (Miss. Ct. App. 2019) (citing *Abercrombie v. Abercrombie*, 193 So. 3d 680, 683 (¶9) (Miss. Ct. App. 2016)). Consequently, we will not consider Wheelan's attachments to his brief.

20

City Council's action within ten days. Vindich argues on appeal that because of this failure, the chancery court lacked jurisdiction and erred in denying the motions to dismiss. In response, Wheelan argues that under the state and federal constitutions, due process claims arise from a city's failure to provide required notice of proceedings, and therefore the chancery court had jurisdiction to hear Wheelan's claims. The special chancery court judge denied Vindich's and the City's motions, and we find no error in that ruling.

¶32. "The standard of review for a trial court's grant or denial of a motion to dismiss is de novo." *Weill v. Bailey*, 227 So. 3d 931, 934 (¶14) (Miss. 2017) (quoting *Burch v. Ill. Cent. R.R. Co.*, 136 So. 3d 1063, 1064-65 (¶3) (Miss. 2014)). "A Rule 12(b)(6) motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint." *Rose v. Tullos*, 994 So. 2d 734, 737 (¶11) (Miss. 2008). Such a motion "should not be granted unless it appears beyond doubt that the plaintiff will be unable to prove any set of facts in support of his claim." *Id.* The jurisdiction of the trial court is critical because if a trial court lacked jurisdiction to address a matter, then we as the appellate court are also without jurisdiction. *Cortez v. State*, 9 So. 3d 445, 446 (¶6) (Miss. Ct. App. 2009).

¶33. Mississippi Code Annotated section 11-51-75 (Rev. 2012) establishes a ten-day limit for a party aggrieved by a decision of a municipality to file a notice of appeal with the circuit court. In most cases, this section has been held to be both mandatory and jurisdictional. *Foster v. Edwards*, 61 So. 3d 960, 963 (¶8) (Miss. Ct. App. 2011). But in *Tippah County v. LeRose*, 283 So. 3d 149, 153 (¶13) (Miss. 2019), the Mississippi Supreme Court held that the

21

direct appeal procedures found in section 11-51-75 are not the exclusive remedy for a due

process challenge to actions by local authorities:

> It is true that this Court has repeatedly held that the statute permitting appeal from a decision of a county board of supervisors within ten days is "both mandatory and jurisdictional." *Lowndes Cty. v. McClanahan*, 161 So. 3d 1052, 1056 (Miss. 2015) (internal quotation marks omitted) (quoting *Newell v. Jones Cty.*, 731 So. 2d 580, 582 (Miss. 1999)). See also Miss. Code Ann. § 11-51-75 (Supp. 2018). But we have also held that a direct appeal is not the exclusive remedy when the complaining parties did not receive notice, if notice was required. In *City of Jackson v. Jordan*, 202 So. 3d 199, 204 (Miss. 2016), this Court held that "[w]hen notice to appear at a hearing is deficient, the remedy of appeal provided for in Section 11-51-75 is not exclusive."

In this case, Wheelan claims that the City Council granted Vindich a variance, not a building

permit. In variance actions, the UDO requires notice to adjoining property owners, which

Wheelan claims was not given; therefore, he claims he was denied due process.

¶34.    State and federal courts have concurrent jurisdiction over 42 U.S.C. §1983 claims.

*Bessent v. Clark*, 974 So. 2d 928, 934 (¶23) (Miss. Ct. App. 2007); *E. Miss. State Hosp. v.*

*Callens*, 892 So. 2d 800, 812 (¶21) (Miss. 2004).

> State courts are not free to refuse or ignore jurisdiction over rights of action which arise under the constitution and laws of the United States. If the ordinary jurisdiction of the state court as prescribed by local law is adequate to the case, the court must accept jurisdiction of such federally created rights.

*Lewis v. Delta Loans Inc.*, 300 So. 2d 142, 144-45 (Miss. 1974). Moreover, one suing under

42 U.S.C. § 1983 to enforce a substantive right need not exhaust administrative remedies.

*Patsy v. Board of Regents*, 457 U.S. 496, 515 (1982). In *Johnson v. City of Canton*, 194 So.

3d 161, 170 (¶36) (Miss. Ct. App. 2015), we said that a challenge to a government's land-use

decision that alleges the decision was arbitrary or capricious states a violation of a substantive right, which is not subject to the exhaustion of administrative remedies bar: "When challenges to land-use decisions aspire to constitutional stature, we view those decisions as 'quasi-legislative' in nature, and thus sustainable against a substantive due process challenge if there exists therefor 'any conceivable rational basis.'" *Id.* (quoting *FM Props. Op. Co. v. City of Austin*, 93 F. 3d 167, 174 (5 Cir. 1996).

¶35.　Thus, if the chancery court here has jurisdiction "as prescribed under local law" per *Lewis*, then it had jurisdiction to hear Wheelan's §1983 claim. "Once the chancery court has jurisdiction on any ground of equity, the chancery court will proceed to a complete adjudication and settlement of all issues." *Derr Plantation Inc. v. Swarek*, 14 So. 3d 711, 718 (¶16) (Miss. 2009) (citing *McClendon v. Miss. State Highway Comm'n*, 205 Miss. 71, 78, 38 So. 2d 325, 327 (1949)). In *Swarek*, the Mississippi Supreme Court said:

> It has long been settled in this state, as one of the pre-eminent principles of equity procedure, that the chancery court, having taken jurisdiction on any one ground of equity, will thereupon proceed in the one suit to a complete adjudication and settlement of every one of all the several disputed questions materially involved in the entire transaction, awarding by a single comprehensive decree all appropriate remedies, legal as well as equitable, although all the other questions involved would otherwise be purely of legal cognizance; and in this state, the rule goes even to the extent that if the ground of equity fail under the proof, the cause may still be retained to a complete final decree on the remaining issues, although the latter present legal subjects only and the decree would cover only legal rights and grant none but legal remedies, . . . that having taken jurisdiction the power of the court to administer full relief is limited by nothing but justice itself.

*Swarek*, 14 So. 3d at 718 (¶18). The *Swarek* court also pointed out that

[t]o determine whether a court has subject matter jurisdiction, we look to the face of the complaint, examining the nature of the controversy and the relief sought. The reviewing court must look to the substance, not the form, of a claim to determine whether that claim is legal or equitable. We have consistently held that if it appears from the face of a well-pleaded complaint that an independent basis for equity jurisdiction exists, our chancery courts may hear and adjudge law claims. In that circumstance, the legal claims lie within the pendent jurisdiction of the chancery court.

*Swarek*, 14 So. 3d at 716 (¶11) (citations and internal quotation marks omitted).

¶36. In this case, Wheelan's claim was essentially equitable because Wheelan sought a chancery court order requiring the City to order to Vindich to remove his workshop. Because Wheelan's suit was equitable in nature, and because state courts have concurrent jurisdiction with federal courts to consider due process claims under 42 U.S.C. § 1983, the chancery court had jurisdiction to hear his claims. Moreover, under *Tippah County*, Wheelan's due process claims relieved him of section 11-51-75's requirement that he first appeal the City Council's permit decision within ten days. Accordingly, the chancery court had jurisdiction and did not err in denying the City and Vindich's motions to dismiss.

## II. Whether the City's decision to grant the permit was unlawful.

¶37. Wheelan argues that the chancery court erred in finding that the City Council's adoption of Vindich's interpretation of Section 5.4.4 F was not arbitrary, capricious, or manifestly unreasonable. We find that because the authority to interpret the wording of an ordinance is vested in the City Council and because the interpretation of the UDO was debatable, the City Council's actions were not arbitrary, capricious, or manifestly unreasonable, and the chancery court did not abuse its discretion, apply an erroneous legal

24

standard, or make a manifestly wrong finding.

¶38.    The Mississippi Supreme Court has held that concerning an ordinance's application, "this Court will affirm a board's zoning decision unless it is clearly 'arbitrary, capricious, discriminatory, illegal, or without a substantial evidentiary basis.'" *Hatfield v. Bd. of Supervisors of Madison Cnty.*, 235 So. 3d 18, 21 (¶10) (Miss. 2017) (citing *Drews v. City of Hattiesburg*, 904 So. 2d 138, 140 (¶5) (Miss. 2005); *Carpenter v. City of Petal*, 699 So. 2d 928, 932 (¶13) (Miss. 1997)).  In *Vineyard Investments LLC v. City of Madison*, 999 So. 2d 438, 440-41 (¶7) (Miss. Ct. App. 2009), we noted that the Mississippi Supreme Court ruled in *Thompson v. Mayfield*, 204 So. 2d 878, 880 (Miss. 1967), that the issuance of a building permit is a "purely ministerial" function; therefore, "a city does not have the discretion to deny a building permit in instances where all applicable building code requirements and zoning ordinances are met by the applicant."   Often in making such decisions, local authorities may need to interpret their ordinances.  "A key function of a county board, city council, or board of aldermen is to interpret its zoning ordinances." *Hatfield*, 235 So. 3d at 21 (¶9)).

¶39.    In *Hatfield*, the supreme court reiterated the function and authority of a local zoning board to interpret its ordinances and held that a board of supervisors's determination that a property owner had violated a county ordinance concerning breeding chickens, ducks, and other fowl was not arbitrary and capricious.  *Id*. at 19 (¶2).  The supreme court also made clear that appellate court's review is not de novo but that deference should be given to the

ruling of the local authorities. *Id.* at 21 (¶11).[12] "Local boards are in the most advantageous position to interpret and apply local ordinances. That is why in construing a zoning ordinance, great weight should be given to the construction placed upon the words by the local authorities." *Id*. at 21 (¶9). The *Hatfield* majority also cautioned against a totally de novo review of local authorities' interpretations of their ordinances as the dissent in that case had suggested, saying:

> [The dissent] recognizes this Court's precedent but advocates we change the law and pursue a new approach. What [it] prefers is a purely de novo review, giving absolutely no deference to interpretations by local governing boards. We disagree with the wisdom of this suggestion. We also see no constitutional infirmity in our present law.

*Id.* at (¶11).

¶40. The supreme court defined the terms "arbitrary" and "capricious" as follows:

> In applying an ordinance, an arbitrary decision is one "not done according to reason or judgment, but depending on the will alone." A capricious decision is one "implying either a lack of understanding of or a disregard for the surrounding facts and controlling principles."

*Id.* at 23 (¶21) (citations omitted). Further, in its opinion, the supreme court in *Hatfield* said: "Still, even if this Court had some uncertainty with the Board's decision, where the issue is 'fairly debatable,' it is the antithesis of arbitrary and capricious." *Id.* at (¶24) (citations omitted). *Hatfield* instructs that zoning interpretations are to be affirmed "unless manifestly

---

[12] "Whatever may be the personal opinion of the judges of an appeal court on zoning, the court cannot substitute its own judgment as to the wisdom or soundness of the municipality's action." *Thomas v. Bd. of Supervisors of Panola County*, 45 So. 3d 1173, 1186 (¶41) (Miss. 2010) (citations omitted).

26

unreasonable." *Id*. at 19 (¶1).

¶41.    All parties here agree that the principles promulgated in *Hatfield*, which were used by the special chancery court judge here, were applicable to Wheelan's case.  The basis of Wheelan's argument is that the City's issuance of a building permit violated the size limitations for accessory building in Section 5.4.4 and thus was unlawful.[13]  In his brief, Wheelan presents a lengthy argument, with calculations and interpretations of key terms in Section 5.4.4 F.[14]  But basically Wheelan argues the same interpretation that the City Building Permit Department used—that the aggregate square footage of Vindich's accessory buildings was limited to 50% of the size of the "main building area," defined as main residence.  Vindich had presented his interpretation of Section 5.4.4 F and calculations in his appeal to the Planning Commission. He contended that "main building area" could also mean "building area" as defined in the UDO, which basically included his entire lot.[15] Both the Planning Commission and City Council acknowledged that the wording of Section 5.4.4 F was "gray" and subject to different interpretations.  At trial, Ankerson agreed, as did Wheelan himself.  When he was questioned at trial, Wheelan said that there could be multiple

---

[13] Wheelan claims that Vindich intentionally chose to seek a permit rather than a variance in order to avoid formal notice to his neighbors. However, he presented no proof of such intent.

[14] Wheelan did not present these calculations at trial.

[15] If the "building area" definition is used as "main building area," Section 5.4.4 F would limit accessory structures 20% of the "rear lot area," which would be less than 50% of the entire lot even subtracting setbacks.

27

interpretations of the ordinance. The mayor and former planning commissioner, as well as one of the City Council members, testified at trial that they were interpreting the ordinance, not granting Vindich a variance from it. In essence, the City Council rejected the department's interpretation of "main building area" as meaning the size of the house and adopted Vindich's definition that it meant the size of the building area, basically the size of the lot. As Vindich calculated in his appeal papers, the 1410-square-foot accessory building was less than 20% of the rear lot area (5,478 square feet), which was the less than 50% of the main building area. It is our opinion that this is one reasonable interpretation of Section 5.4.4 F. Accordingly, we find that the City Council's decision was "fairly debatable" and that this interpretation was not manifestly unreasonable. *See Jones v. Lutken*, 62 So. 3d 455, 459 (¶19) (Miss. Ct. App. 2011).

¶42. The dissent contends that the City Council's interpretation of the term "main building area" is manifestly unreasonable because such a definition nullifies other portions of the UDO provision. The dissent says that interpreting the "main building area" as Vindich's entire lot would mean that the comparison of the lesser "50% of the main building area" to "20% of the rear lot" will always result in the 20% prevailing. The dissent says this violates existing precedent, found in *Hemphill Construction. Co. v. City of Clarksdale*, 250 So. 3d 1258, 1263 (¶15) (Miss. 2019), that "a construction which will render any part of a statute inoperative, superfluous, or meaningless is to be avoided." But this mandate arose in a case where a city was interpreting a state statute on bidding procedures, not in a case like this one

where a city is interpreting its own zoning ordinance.[16]   This is not a case where we as an appellate court are being asked to examine a city's interpretation of a statute as in *Hemphill* or to review a chancery court's decision on the interpretation of a statute as in *Davis v. Miller*, 202 Miss. 880, 32 So. 2d 871 (Miss. 1947), which is the other case the dissent cites.

---

[16] In *Hemphill*, the City of Clarksdale advertised a water works project, and two companies bid, Landmark and Hemphill. *Hemphill*, 250 So. 3d at 1260 (¶¶2-3). When bids were opened, Landmark's bid was the lower, but it was still more than 10% over the funds allocated for the project. *Id*. Clarksdale's grant manager told the City that their CDBG grant could be increased and the Clarksdale Public Utilities Commission could also match the additional fund, making up the amount that Landmark bid. *Id*. The City did this, got the funds, and contracted with Landmark. *Id*. at (¶6). Hemphill filed a bill of particulars. *Id*. at (¶7). The circuit court found for the City and Hemphill appealed. *Id*. at 1261 (¶¶8-9). The Mississippi Supreme Court reversed. The statute concerning a municipality's authority to accept a bid, Mississippi Code section 31-7-13(d)(iv) (Rev. 2020), provides that:

> if the lowest and best bid is not more than ten percent (10%) above the amount of funds allocated for a public construction or renovation project, then the agency or governing authority shall be permitted to negotiate with the lowest bidder in order to enter into a contract for an amount not to exceed the funds allocated.

*Id.* at 1261 (¶14). The supreme court said that Landmark's bid was not less than 10% of the initially allocated funds, and so the city had no authority to accept the bid. *Id.* When the City tried to argue that the statute necessarily implied its authority to act as it did, the supreme court recounted what the City had done and concluded:

> These steps, taken after the bids were opened, frustrate the powers expressly granted, clearly given, or necessarily implied in the public-purchasing laws and render the ten-percent limitation not only superfluous, but meaningless. "A construction which will render any part of a statute inoperative, superfluous, or meaningless is to be avoided." *McCaffrey's Food Market Inc. v. Miss. Milk Comm'n*, 227 So.2d 459, 463 (Miss. 1969).

*Id.* at 1262-63 (¶15).

As noted in *Tinseltown Cinema LLC v. City of Olive Branch*, 158 So. 3d 367, 373 (¶18) (Miss. Ct. App. 2015):

> there is a distinct difference between a review of a municipal board's interpretation of a statute and its interpretation of an ordinance. Like other questions of law, a board's interpretation of a statute calls for a de novo review. However, we are bound to give "great weight" to a local government's construction of zoning ordinances unless it is manifestly unreasonable.

(Citations omitted). If "[t]he language of the ordinance is . . . flexible enough to accommodate the City's interpretation," the interpretation is not manifestly unreasonable. *Roundstone Dev. LLC*, 105 So. 3d at 320 (¶12). In the case before us, we find that there are several interpretations of the ordinance, and the language of the ordinance does accommodate the interpretation adopted by the City Council.

¶43. The dissent itself presents interpretations of the UDO in question that the City could have adopted that would also have allowed Vindich to build his workshop.[17] This shows the debatable nature of the meaning of the words in Gautier's UDO, which we have previously found to be the province of the governing authority to decide. For example, in *Jones v. Lutken*, 62 So. 3d 455 (Miss. Ct. App. 2011), we upheld a board of supervisors'

---

[17] If we were to adopt the *Hemphill* mandate, we would have to find one of the dissent's interpretations faulty as well. The dissent says that a "reasonable interpretation" is that "main building area" could mean the "Maximum Lot Coverage"—twenty-five percent of the lot. But this interpretation ascribes the same meaning to two different terms in the UDO (the "Maximum Lot Coverage" and "main building area"). Moreover, such an interpretation ignores the intent of the second sentence of this UDO provision, which specifically addresses the sizes of "accessory buildings" only.

interpretation of an ordinance because certain terms were not defined and debatable; thus the board's decision was not manifestly unreasonable. In that case, Jones's RV park operated as a permissible non-conforming use to Washington County zoning ordinances. *Id*. at 457 (¶3). The ordinance provided, however, that "nonconformities shall not be enlarged upon, expanded, or extended, nor be used as grounds for adding other structures or uses prohibited elsewhere in the same district." *Id.* Jones later sold portable cabins, and two purchasers placed them on two of the RV park lots. *Id*. at 457 (¶4). The county planning commission considered these cabins as permissible continuations of Jones's permissible non-conforming use. *Id*. at 457 (¶6). Nearby homeowners appealed to the board of supervisors, which upheld the commission's decision. *Id*. at 457 (¶7). Homeowners appealed, and the circuit court reversed the board's decision, finding that the placement of the cabins was an expansion of Jones's non-conforming use. *Id*. at 457 (¶8). On appeal, we noted:

> The Board of Supervisors was faced with these questions and had to interpret the zoning-ordinance language. The words "expansion" and "continuation" were not clearly defined, precise terms in the zoning ordinance. These words must be interpreted and applied within the context of a given factual scenario. It is the role of the Board of Supervisors to make these judgments, subject to limited appellate review.

*Id.* at 459 (¶18). We also noted that when construing an ordinance, great weight should be given to the construction of the local authorities unless manifestly unreasonable. *Id*. at (¶19). We reiterated that when the issue is fairly debatable, then the decision of local authorities should be affirmed. *Id.* We opined that the board's interpretation that the ordinances definition of an RV could include a portable cabin and that the board's decision was fairly

31

debatable. *Id.* We held that the board's decision was not manifestly unreasonable. *Id*. Similarly, in this case, we find the interpretation of Gautier's UDO on maximum lot coverage was fairly debatable, and the City Council's interpretation was not manifestly unreasonable.

¶44. In addition, after the City Council met and granted Vindich's permit, the director of the building permit department testified that they have used that interpretation of the UDO ever since. All acknowledged that there were different ways to interpret the ordinance, and once the City Council chose an interpretation, future matters were decided using that interpretation. Wheelan argued that the case of *City of Ocean Springs v. Psycamore LLC*, 124 So. 3d 658 (Miss. 2013), where Mississippi Supreme Court said that "the best interpretation of a city ordinance is the city's history of applying that ordinance." *Id*. at 662 (¶16). But Wheelan presented no evidence that prior building permits that had been issued *by the City Council* using Wheelan's interpretation. There was no proof that the City Council had previously approved and used a specific interpretation of Section 5.4.4 from which it deviated in Vindich's case. It appears that the City Council had not been presented with the issue prior to Vindich's permit application. As already mentioned, according to the city planning director's testimony at the June 2018 trial, the department has used the Vindich interpretation since the Council made its decision in April 2016. While prior history of use is important, we have no evidence of that; therefor, the subsequent use becomes significant as well, which weighs against Wheelan. The department obviously considered the City Council's action as a directive on the interpretation of Section 5.4.4 F and has since applied

32

it.

¶45. In light of the evidence presented at trial, Wheelan did not prove, nor can we say, that the City Council's actions were done without reason, in a whimsical manner, or with a disregard of the facts. The City Council performed its legitimate function of interpreting an ordinance that the record shows was subject to different debatable interpretations. We cannot say that the grant of the permit was "manifestly unreasonable." Therefore, we affirm the chancery court's ruling that the City Council's grant of a building permit was not arbitrary, capricious, or without a substantial basis.

### III. Whether Wheelan was deprived of due process because he and other neighbors received no notice of the public hearing on Vindich's appeal and the City Council meeting on the Planning Commission's recommendation.

¶46. Wheelan argues that he and neighboring property owners were given no notice of Vindich's appeal to the Planning Commission nor of the City Council meeting that accepted the Planning Commission's recommendation. Wheelan claims that both local authorities granted Vindich a de facto variance, not a permit, and that he did not receive notice of the variance proceedings, thereby depriving him of his due process rights. The City maintains that Vindich applied for a building permit, not a variance, and it was processed and approved as such. The UDO does not require private or public notice for the appeal of a staff decision of a building permit application. After a review of the record, we find no merit to Wheelan's

due process claim.[18]

¶47.    Whether the City deprived Wheelan of his due process rights by failing to provide him with notice and a right to be heard on Vindich's application obviously depends on whether Wheelan had such a right.  This in turn depends on whether the Planning Commission and City actually considered Vindich's application and appeal as a request for a variance, or whether it considered its actions as the interpretation of an ordinance.

¶48.    Section 4.18 defines a variance:

> In certain circumstances, a [v]ariance from the dimensional requirements (i.e. height, setbacks, square footage) of this ordinance may be granted if the applicant can prove that because of physical constraints of the property involved, he is not able to build the same type of structure that other persons with the same zoning classification can build. . ..

Eligibility for a variance, found in Section 4.18.4, includes:

> The Variance application shall demonstrate the following:

---

[18] Wheelan also argues that the department staff did not properly process Vindich's appeal of his building permit denial, saying that there was no *written* staff decision of the denial and no review of the appeal application by the City Attorney.  But Wheelan did not raise these deficiencies in the permit procedure to the chancery court, so he is barred from arguing them now on appeal.  "We need not consider matters raised for the first time on appeal, which practice would have the practical effect of depriving the trial court of the opportunity to first rule on the issue, so that we can then review such trial court ruling under the appropriate standard of review." *Stephens v. Miller*, 970 So. 2d 225, 227 (¶9) (Miss. Ct. App. 2007) (citing *Alexander v. Daniel*, 904 So. 2d 172, 183 (¶26) (Miss. 2005)).  Moreover, these deficiencies in the Vindich's permit denial appeal process are not a different argument on the same issue as Wheelan claims.  The issue here is whether the Planning Commission and City Council in fact granted Vindich a variance that required personal and public notice to his neighbors, not whether the City's processing of Vindich's appeal of the staff decision denying his permit application was defective.

A.      That special conditions and circumstances exist which are peculiar to this particular site(lot or parcel), structure or building involved and which are not applicable to other sites (lots or parcels) or structures or buildings in the same district;

B.      That literal interpretation of the provisions of this Ordinance would deprive the applicant of rights commonly enjoyed by other properties in the same district under the provisions of this Ordinance;

C.      That the special conditions and circumstances do not result from actions of the applicant; and

D.      That granting the Variance requested will not confer upon the applicant any special privilege that is denied by this Ordinance to other similar sites (lots or parcels)structures or buildings in the same district.

UDO Section 4.14.2 indicates that a review of a request for a variance at both the Planning Commission and City Council levels requires public notice, including publication in a local newspaper of general circulation.[19] Clearly, if Vindich's application was in fact an application for a variance, then notice by publication and mailing was required.

¶49.    But the evidence presented in this case shows that from the beginning, Vindich sought a building permit and that the City Council considered and granted him a permit, not a

---

[19] According to Section 4.14.2 A, this notice must contain:

1. Parcel Identification Number
2. Address of the subject property (if available)
3. A description of the action requested
4. The time, date and location of the public hearing
5. A phone number to contact Economic Development/Planning Department
6. A statement that interested parties may appear at the public hearing and shall have the opportunity to be heard.

Also under Section 4.14.3 A, "The Economic Development Director, or his designee, shall notify by first class mail all property owners within the appropriate notification distance from the property under consideration for a Rezoning, Conditional Use, Variance or Home Occupation."

variance. All documents entered into evidence show that Vindich applied for a building permit, not a variance. The application itself is entitled "Application for a Residential Building Permit" and did not contain the elements required in an application for a variance. Furthermore, the appeal form he completed was for an appeal from a "staff decision" that denied his building permit application, not from a denial of a variance. Thus, from the beginning, Vindich was not applying for a variance but for a building permit that he contended met the requirements of the UDO under one interpretation of its language.

¶50.    But Wheelan argues that the use of the word "exception" by one commissioner during the Planning Commission meeting indicates that the commissioners were not in fact voting on an interpretation of the ordinance but on an exception to it, i.e., a variance, which required notice. We disagree. At trial, Mayor Torgusen, who served on the Planning Commission that approved Vindich's permit, explained that he did not use word "exception" to mean that he considered his action as granting a variance to the ordinance. He said he meant that the language of the UDO needed interpretation and that he saw no harm in applying to Vindich's application the interpretation that they planned to use in an amended UDO with more clearly defined terms. The staff as well as City Council member Anderson testified that they agreed that no variance was granted. Everyone, including Wheelan, admitted that the UDO terms were subject to interpretation and that Vindich's interpretation was reasonable. Since no variance was applied for or granted, Wheelan was not entitled to any further notice.

¶51.    Wheelan cites *Robinson v. Indianola Municipal School District*, 467 So. 2d 911 (Miss.

1985), as support for his argument that he was entitled to additional notice. But *Robinson* is distinguishable and in applicable to the facts of this case. In *Robinson*, the school district sought to build a new gymnasium on property it owned located across the street from Robinson's home. *Id*. at 913. The Indianola off-street parking ordinance required "a parking space for each four seats in the main auditorium of a school or one space for each seventeen classroom seats, whichever is greater." *Id.* at 914. Given the size of the gymnasium proposed, the parking ordinance would require between 375 and 500 parking spaces to accommodate a capacity crowd of 1,500 to 2,000. *Id*. at 916. But the school district's plan included only 53 permanent parking spaces with 40 additional temporary spaces off Battle Street. *Id.* The School District did not request nor was it granted a variance by the City of Indianola from the parking ordinance requirements; the district merely altered the distance that the gymnasium would be set back from the street. *Id.* at 914. The superintendent and architect met with the city planning commission, which approved the plan. *Id*. at 913. On appeal from the chancery court's dismissal of Robinson's lawsuit, the Mississippi Supreme Court held that the school district was bound by the city's zoning ordinance requiring that off-street parking be proportional to the auditorium capacity. *Id*. at 917. The school district had argued that it had been granted a variance when the city approved its construction plans. *Id.* But the supreme court pointed out that "the city's own zoning ordinance requires public notice and hearing in order to validly grant a variance, a requirement that was not fulfilled." *Id.*

¶52.  This case differs from *Robinson* because *Robinson* did not deal with the *interpretation* of an ordinance but merely with the *application* of a clear, undebatable ordinance that set out parking requirements based on the gymnasium's seating capacity. The supreme court held that to deviate from that clearly stated ordinance, Indianola was required to give notice to the public. In the case at hand, Gautier's Planning Commission and City Council needed to interpret the wording of its UDO provisions and then apply that interpretation to Vindich's permit application. The provisions were "gray," and the concepts used were subject to different interpretations. Unlike the City of Indianola, here the City of Gautier was not considering a permit application that deviated from a clearly worded, undebatable ordinance. Here the City interpreted language in its ordinance and found Vindich's permit application in compliance with its UDO requirements.

¶53.  In this case, because the UDO provisions do not require public notice of the appeal of a staff decision, because the documents presented showed that Vindich applied for a building permit and not a variance, and because witnesses for the City testified that the Planning Commission and City Council did not grant a variance but rather adopted an interpretation of its ordinances provisions that was fair and reasonable, we find no basis for determining that the City's actions required notice to the public or Wheelan. Therefore, we find that Wheelan was not deprived of any due process rights.[20]

---

[20] We further note that Vindich did notify Wheelan of his intent to build and that Wheelan was aware of the size of the building when he measured the framing for the slab in June before it was poured. Wheelan knew of the City Council's approval of the permit by

**IV. Whether Vindich was entitled to damages, costs, and attorney's fees.**

¶54. Because the chancery court judge decided that Wheelan failed to prove a nuisance claim against Vindich, post-hearing Vindich requested an award of attorney's fees pursuant to Mississippi Code Annotated section 11-55-5. He argued that Wheelan had filed a case against him "without substantial justification." The chancery court denied Vindich's motion for attorney's fees. Vindich appeals this denial and further, he seeks attorney's fees for what he considers a frivolous appeal by Wheelan under Mississippi Rule of Appellate Procedure 38. We find no error in the chancery court's ruling, and because of this, Wheelan's appeal is not frivolous either.

¶55. Mississippi Code Annotated 11-55-5(1) provides for an award of attorney's fees in limited circumstances:

> (1) Except as otherwise provided in this chapter, in any civil action commenced or appealed in any court of record in this state, the court shall award, as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorney's fees and costs against any party or attorney if the court, upon the motion of any party or on its own motion, finds that an attorney or party brought an action, or asserted any claim or defense, that is without substantial justification, or that the action, or any claim or defense asserted, was interposed for delay or harassment, or if it finds that an attorney or party unnecessarily expanded the proceedings by other improper conduct including, but not limited to, abuse of discovery procedures available under the Mississippi Rules of Civil Procedure.

---

July and met with department personnel and later attended a Planning Commission meeting about it. So he had actual notice of the approval and of the dimensions of Vindich's planned building in July, but he took no action to stop it until October after Vindich had spent nearly $40,000 in construction costs and had the building nearly completed.

We review the chancery court's grant or denial of attorney's fees requested under this statute for an abuse of discretion. *Kuhn v. High*, 302 So. 3d 630, 640 (¶26) (Miss. 2020). To reverse the chancery court denial of fees, we would have to be of "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors . . . ." *Id*.

¶56. "An action or filing made without substantial justification is one that 'is frivolous, groundless in fact or in law, or vexatious, as determined by the court.' Miss. Code Ann. § 11-55-3(a) (Rev. 2012)." *Garner v. Smith*, 277 So. 3d 536, 541 (¶17) (Miss. 2019). "A claim is frivolous when 'objectively speaking, the pleader or movant has no hope of success.'" *Id*. at (¶18) (citation omitted). For example, an amended complaint in action challenging a garnishment was frivolous and sanctionable where it made essentially the same allegations that were stated in original complaint, which was dismissed for failure to state a claim. *Triplett v. Brunt-Ward Chevrolet, Oldsmobile, Pontiac, Buick, Cadillac, GMC Trucks Inc*., 812 So. 2d 1061, 1067-68 (¶14) (Miss. Ct. App. 2001). But a case that is "weak" or "light-headed" is not frivolous. *Cont'l Cas. Co. v. Allstate Prop. & Cas. Ins. Co.*, 235 So. 3d 40, 58 (¶74) (Miss. 2017).

¶57. Vindich begins by arguing that he is entitled to fees because Wheelan failed to exhaust his administrative remedies before filing suit, and thus Wheelan's suit in chancery court was filed out of time. Because we hold that Wheelan's due process claim did not require an exhaustion of administrative remedies, Wheelan's chancery court filing was not "without

justification" based on a failure to exhaust administrative remedies.

¶58.   Vindich next cites *Alexander v. Pitts*, 229 So. 3d 1073 (Miss. Ct. App. 2017), to support his claim that Wheelan's suit was frivolous.  In that case, Pitts had purchased the property from Lowe who had obtained it in a tax sale and confirmed his title.  *Id*. at 1074 (¶2).  Pitts's neighbor Alexander sued Pitts for adverse possession of property along a fence line. *Id*. at 1074 (¶3).  Pitt moved to dismiss. *Id*. at (¶4).  After a hearing, the chancery court denied Alexander's request for a preliminary injunction.  *Id*. at 1075 (¶5).  In a subsequent hearing on the matter, Alexander challenged the legality of the tax sale by which Pitts's previous owner had obtained the property. *Id*. at (¶9).  The chancery court held that Alexander had not pleaded any collateral attack on the tax sale and that the tax sale had ended Alexander's interest in the land.  *Id.*  After trial, Alexander moved for a new trial to put on evidence of irregularities in the tax sale. *Id*.  The chancery court denied Alexander's motion because the issue had not been presented at trial.  *Id*. at 1076 (¶10).  On appeal, Alexander did not challenge any ruling of the chancery court but attempted to collaterally attack the tax sale again, raising arguments not made before the chancery court. *Id*. at (¶11). Alexander cited no authority for his claims and no authority to support an attack on the tax sale through his appeal. *Id*  We found that "[b]ecause Alexander clearly relied on the idea that he would circumvent the chancellor and raise an issue for the first time on appeal, his attempted collateral attack on judgments that did not stem from the underlying litigation had no hope of success." *Id*. at 1077 (¶14).  Based on the finding that Alexander's appeal was

41

frivolous under Mississippi Rule of Appellate Procedure 38, the case was remanded for the chancery court to assess attorney's fees. *Id*. at (¶15).

¶59. The facts of the case at hand differ significantly from those in *Alexander*. Here Wheelan filed suit against the City on his claims for denial of due process and against Vindich for nuisance. He appealed the denial of due process claim which had been tried before the chancery court judge. Wheelan is raising no new issue on appeal as did Alexander.

¶60. Vindich next argues that Wheelan's nuisance claim against him was frivolous because Wheelan had no right to an unobstructed view across Vindich's property. As support, Vindich cites *Blackwell v. Lucas*, 271 So. 3d 638 (Miss. Ct. App. 2018), in which we made such a ruling. *Id*. at 640-42 (¶7, 10). But the defendants in *Blackwell* raised no issue of the filing being frivolous or for attorney fees. We note that the *Blackwell* case was decided in November 2018, months after the trial of this case in June 2018. Therefore, we cannot hold Wheelan to precedent that had not been established because an appellate court looks to the facts known at the time of filing a complaint. *Eatman v. City of Moss Point*, 809 So. 2d 591, 594 (¶12) (Miss. 2000). Moreover, Wheelan also pleaded due process claims for which he sought an injunction that would ultimately make Vindich remove his workshop. Vindich was clearly a necessary party to the case under Rule 19 of the Mississippi Rules of Civil Procedure. "We also recognize the maxim of equity which states that all persons with an interest in the subject of litigation whose interest will be affected by the judgment must be

made parties to the action, to enable the court to do complete justice and not by halves." *Mahaffey v. Alexander*, 800 So. 2d 1284, 1286 (¶6) (Miss. Ct. App. 2001). Therefore, we cannot hold that Wheelan filed a case that had no hope of success, and we find no merit to Vindich's claim for attorneys fee's for filing a frivolous claim under section 11-55-5.

¶61. Nor is Vindich entitled to attorney's fees under Rule 38 of the Mississippi Rules of Appellate Procedure. Rule 38 provides, "In a civil case if the Supreme Court or Court of Appeals shall determine that an appeal is frivolous, it shall award just damages and single or double costs to the appellee." M.R.A.P. 38. An appeal may be frivolous if the appellant has absolutely no hope of success. *Mabus v. Mueller Indus.*, No. 2019-WC-00983-COA, 2020 WL 4436288, at *11 (¶48) (Miss. Ct. App. June 23, 2020), *cert. denied*, Order, No. 2019-CT-00983-SCT (Miss. Feb. 4, 2021). But if it can only be said that an "appellant does not appear to have much hope of success," we cannot conclude that he has no hope of success. *Id.* (quoting *In re Estate of Cole*, 256 So. 3d 1156, 1160 (¶13) (Miss. 2018).

¶62. In this case, Wheelan did not appeal the nuisance issue. But for Vindich's cross-appeal of the chancery court's denial of his slander of title claim, Vindich would not even be a party to this appeal. We cannot sanction Wheelan for an appeal he did not file. Therefore, Vindich is not entitled to attorney's fees under Mississippi Rule of Appellate Procedure 38.

    **V.    Whether the chancery court erred in dismissing Vindich's counter-claim against Wheelan for slander of title**.

¶63. In his cross-appeal, Vindich claims that the chancery court erred in dismissing his

43

slander of title counter-claim against Wheelan. We find no abuse of discretion or manifest error by the chancery court on this issue because Vindich's title was not disparaged.

¶64. "To succeed in an action for slander of title, a claimant must show that another has falsely and maliciously published statements that disparage or bring into question the claimant's right of title to the property, thereby causing special damage to the claimant." *Mize v. Westbrook Const. Co. of Oxford LLC*, 146 So. 3d 344, 348 (¶7) (Miss. 2014) (citing *Walley v. Hunt*, 212 Miss. 294, 304, 54 So. 2d 393, 396 (1951)). Key to this cause of action is that the false and malicious statements disparage one's **title** to property. Here the chancery court correctly found that any of Wheelan's alleged disparaging statements concerned the legitimacy of Vindich's permit to build, not Vindich's title to his land. All cases cited by Vindich as support dealt with statements or actions inferring that an individual did not actually have title to the property he claimed. *Mize* was a suit to confirm title based on a corrected deed in a boundary dispute between adjoining land owners. *Mize*, 146 So. 3d at 347 (¶5). In *Butler v. City of Europa*, 725 So. 2d 158, 161 (¶11) (Miss. 1998), Butler sued the city for laying waterlines on property before identifying the proper owners. Another case Vindich cites was brought by an a heir who claimed title to the lands allotted to the other heirs in a partition action. *Phelps v. Clinkscales*, 247 So. 2d 819, 820 (Miss. 1971). Again, title to property was involved. *Id*. In *Walley v. Hunt*, 212 Miss. 294, 305, 54 So. 2d 393, 396 (1951), the supreme court described the type of statement underlying a slander of title claim: "[t]he false statement may consist of an assertion that plaintiff has no title to the property of

44

which he is the ostensible owner, or that his title is defective, or that defendant has an interest in or lien upon the property." Here, Vindich has presented no authority that Wheelan's statements questioning the validity of Vindich's building permit constitutes slander of title. Accordingly, the chancery court did not err when it dismissed Vindich's slander-of-title claim against Wheelan.

## CONCLUSION

¶65. We find that the City of Gautier's interpretation of its UDO provisions was not arbitrary, capricious, or manifestly unreasonable and that its issuance of a permit to Vindich was not unlawful. Finding no error or abuse of discretion by the special chancery court in the dismissal of Wheelan's deprivation of due process claim and its dismissal of Vindich's slander-of-title claim, we affirm the chancery court's judgment in this matter.

¶66. **AFFIRMED.**

**BARNES, C.J., GREENLEE, McCARTY AND SMITH, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J. WESTBROOKS AND LAWRENCE, JJ., NOT PARTICIPATING.**

**WILSON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶67. I concur that the chancery court had jurisdiction to consider Wheelan's challenge to the City Council's order granting Vindich's building permit. I also concur insofar as the majority affirms the chancery court's denial of Vindich's counterclaim for slander of title and holds that Vindich is not entitled to recover attorney's fees for the trial or appeal. I respectfully dissent in part because the City's interpretation of its ordinance cannot be

45

upheld. Although there are reasonable interpretations of the subject ordinance under which the City could have granted Vindich's application for a building permit, the City's interpretation is manifestly unreasonable. For that reason, the judgment of the chancery court should be reversed in part, and the City Council's order should be vacated.

### I. The chancery court had jurisdiction to decide Vindich's claim that the City improperly granted a variance without notice.

¶68. As a threshold matter, Vindich argues that the circuit court lacked jurisdiction because Wheelan failed to appeal the City Council's decision within ten days as required by Mississippi Code Annotated section 11-51-75 (Rev. 2019).[21] However, our Supreme Court has "held that a direct appeal [under section 11-51-75] is not the exclusive remedy when the complaining parties did not receive notice, *if notice was required*." *Tippah County v. LeRose*, 283 So. 3d 149, 153 (¶13) (Miss. 2019) (emphasis omitted; emphasis added). In the present case, Wheelan was not entitled to notice of the hearing before the City Council if it involved nothing more than a run-of-the-mill application for a building permit. But Wheelan was entitled to notice if the Council's decision in substance granted Vindich a variance from the requirements of the City's Uniform Development Ordinance (UDO). Thus, the jurisdictional issue that Vindich raises is bound up with Wheelan's claim that the City unlawfully granted a variance without notice. I agree that we have jurisdiction to consider

---

[21] While this case was pending, the Legislature amended section 11-51-75 to provide that such an appeal should be filed by filing a notice of appeal rather than a bill of exceptions. *See* 2018 Miss. Laws ch. 448, § 1 (H.B. 1239).

the merits of that claim. *Cf. Bell v. Hood*, 327 U.S. 678, 682-83 (1946) (holding that federal courts have jurisdiction to decide claims that allegedly arise under federal law unless the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous").

## II. The City's interpretation of the zoning ordinance is manifestly unreasonable.

¶69. Although this case has a lengthy procedural history and the record includes hearings before the Planning Commission and the City Council and a bench trial in chancery court, the dispositive legal issue in the case is narrow: whether the City's interpretation of Section 5.4.4.F of the City's UDO is "manifestly unreasonable." *Hatfield v. Bd. of Supervisors of Madison Cnty.*, 235 So. 3d 18, 21-22, 25 (¶¶9, 20, 35) (Miss. 2017). Section 5.4.4.F, which applies to the "Low Density Single-Family Residential District," states:

> F. **Maximum Lot Coverage**—Twenty-five (25) percent for the principal structure and accessory structures. Accessory structures shall not exceed twenty (20) percent of the rear lot area or fifty (50) percent of the main building area, whichever is less.

The dispute in this case focuses on the second sentence of this provision and, more specifically, the City's interpretation of "main building area."[22] The provision is ambiguous

---

[22] On appeal, Wheelan alleges that Vindich's metal building also violates the ordinance because it "exceed[s] twenty (20) percent of the rear lot area"; however, Wheelan ultimately states that the rear-lot-area calculation is "immaterial" because he should prevail on other grounds. In any event, Wheelan waived this issue because he failed to present any evidence or argument on the issue in the chancery court. *See, e.g.*, *Adams v. Bd. of Supervisors of Union Cnty.*, 177 Miss. 403, 170 So. 684, 685 (1936) ("It is a long-established rule in this state that a question not raised in the trial court will not be considered on

because, among other reasons, the UDO does not define "main building area."

¶70. As an initial matter, the record does not include a clear statement of the City's Council's interpretation of the ordinance. The Council voted 4-3 to grant Vindich's application for a building permit, but the Council's order does not specify how it interpreted the ordinance or why it granted the application. The City represents that the Council interpreted the phrase "main building area" to mean the "entire lot," which is the primary interpretation that Vindich urged before the Planning Commission and City Council. *See* City's Br. at 4-5. The City's planning director, Scott Ankerson, also testified at trial that the City Council adopted Vindich's interpretation and that the planning department has applied that interpretation ever since. Given that Wheelan does not dispute this point, it is appropriate to accept the City's representation regarding the Council's interpretation.

¶71. The problem is that the City's interpretation of Section 5.4.4.F leads to absurd results and renders parts of the ordinance meaningless. For example, while the City's interpretation of "main building area" would permit the homeowner to build accessory structures covering up to fifty percent of the "entire lot," the immediately preceding sentence of the ordinance limits the principal structure *and all accessory structures combined* to only *twenty-five percent* of the lot area. Logically, twenty-five percent of the lot is *always* less than fifty percent of the lot. Therefore, the twenty-five-percent limitation in the first sentence will *always* control—and the City's interpretation of the fifty-percent limitation will *never* apply.

_____

appeal.").

As a result, the City's interpretation of the phrase "main building area" renders that very phrase a nullity.

¶72.    The City's interpretation of "main building area" also cannot be reconciled with the first part of the same sentence. The first part of the sentence states that accessory structures "shall not exceed twenty (20) percent of the rear lot area."[23] Logically, twenty percent of the rear lot area will *always* be less than fifty percent of the entire lot. Therefore, the twenty-percent limitation will *always* control, and the City's interpretation of the fifty-percent limitation will *never* apply. Thus, for this reason as well, the City's interpretation of "main building area" to mean the "entire lot" renders that very phrase a nullity.

¶73.    We are bound by a local government's interpretation of its zoning ordinances unless the interpretation is "manifestly unreasonable." *Hatfield*, 235 So. 3d at 21-22, 25 (¶¶9, 20, 35).[24] However, "[a] construction which will render any part of a statute inoperative,

---

[23] As noted above, Vindich failed to present any evidence or argument regarding the rear-lot-area limitation in the chancery court. Therefore, that limitation is not at issue in this appeal. *See supra* note 22.

[24] In *Hatfield*, the Supreme Court reaffirmed this deferential standard of review over a dissent. *See id.* at 25-29 (¶¶38-46) (Coleman, J., dissenting) (arguing that the interpretation of an ordinance is a question of law and should be reviewed de novo). Since *Hatfield* was decided, the Supreme Court has held that a state agency's interpretation of a statute is a question of law that a reviewing court must review de novo, *King v. Miss. Military Dep't*, 245 So. 3d 404, 408 (¶12) (Miss. 2018), and that a state agency's "[i]nterpretation of a rule or regulation governing the agency concerns a matter of law, which is reviewed de novo, with great deference afforded to the agency's interpretation of the rule." *Miss. Div. of Medicaid v. Windsor Place Nursing Ctr. Inc.*, 296 So. 3d 68, 72 (¶15) (Miss. 2020). However, I agree with the majority that *Hatfield* continues to state the applicable standard of review of a city council's interpretation of a zoning ordinance.

49

superfluous, or meaningless is to be avoided." *Hemphill Constr. Co. v. City of Clarksdale*, 250 So. 3d 1258, 1263 (¶15) (Miss. 2019) (quoting *McCaffrey's Food Mkt. Inc. v. Miss. Milk Comm'n*, 227 So. 2d 459, 463 (Miss. 1969)). "Courts are not at liberty to ascribe to any statute a construction which would make a part of it, in some cases, meaningless and ineffective if another reasonable construction can be found which would give it meaning and effectiveness in all cases within its purview." *Davis v. Miller*, 202 Miss. 880, 890, 32 So. 2d 871, 873 (1947).

¶74.    The City's interpretation of the ordinance in this case is manifestly unreasonable because it renders meaningless the "main building area" language and its fifty-percent limitation. As set out above, under the City's interpretation of the ordinance, this language and limitation will *never* apply. Such an interpretation of the ordinance is manifestly unreasonable and cannot be upheld if there is a reasonable alternative interpretation that will give effect to all of its provisions.

¶75.    Reasonable alternative interpretations are available. For example, "main building area" could be interpreted to mean the area of the main building on the property—in this case, Vindich's home. This was how the City's planning director originally interpreted the ordinance when he denied Vindich's application.

¶76.    Moreover, this interpretation of "main building area" would permit two different reasonable alternative interpretations of the ordinance. In relevant part, the ordinance states, "Accessory structures shall not exceed . . . fifty (50) percent of the main building area . . . ."

50

The City could interpret this language to mean that the combined area of all accessory structures on the property shall not exceed fifty percent of the area of the home. Because Vindich already has other accessory structures on his property, this interpretation would not permit him to build his 1,410-square-foot metal building. However, the City also reasonably could interpret the ordinance to mean only that no one accessory structure may exceed fifty percent of the area of the home—i.e., as a limit on the size of each individual accessory structure, not a limit on the total area of all such structures. This interpretation *would* permit Vindich to build his metal building.

¶77. In addition, the phrase "main building area" reasonably could be interpreted as a reference to the "Maximum Lot Coverage" that the ordinance establishes for all principal and accessory structures, i.e., twenty-five percent of the lot. That is, the "main building area" could be read to mean the maximum area that buildings may cover. The first sentence of the ordinance establishes that the principal structure and all accessory structures may not cover more than twenty-five percent of the lot—in this case, 8,276.4 square feet. The "main building area" limitation could be interpreted to permit the homeowner to allocate up to fifty percent of that area to accessory structures. This interpretation would also permit Vindich to build his 1,410-square-foot metal building.

¶78. In summary, the City's interpretation of Section 5.4.4.F of its UDO is manifestly unreasonable. Therefore, we should reverse the judgment of the chancery court with instructions to vacate the City Council's order granting the building permit. The Council

51

would be free to revisit Vindich's application based on a reasonable interpretation of the ordinance.

**CARLTON, P.J., JOINS THIS OPINION.**